[No. 21261-3–I. Division One. June 26, 1989.]

DONATO GAETA, *Appellant,* v. SEATTLE CITY LIGHT, *Respondent.*

---

[2]Because we vacate Leech's felony murder conviction, we need not address his additional assignments of error.

PEKELIS, J., concurs by separate opinion.

*K.R. St. Clair,* for appellant.

*James M. Doran, John C. Belcher,* and *Belcher, Swanson, Lackey & Doran,* for respondent.

SCHOLFIELD, J.—Donato Gaeta appeals the trial court's dismissal of his action against Seattle City Light for injuries caused when the tire of his motorcycle caught in the tracks on Seattle City Light's road over Diablo Dam. We affirm.

## FACTS

Gaeta was a Connecticut resident engaged in a cross–country sightseeing tour by motorcycle. On August 5, 1985, Gaeta was driving the North Cascades Highway. He turned off the highway onto a road leading to Diablo Dam for the dual purpose of looking at the scenery and getting gas. As Gaeta proceeded down the road toward the dam, he

encountered three diamond–shaped warning signs. These signs were as follows: (1) "10 m.p.h." advisory speed sign; (2) a sign warning of a "narrow road"; and (3) an S–shaped arrow, indicating a winding road.

The roadway atop Diablo Dam is under the control of Seattle City Light pursuant to its license with the United States government. That license provides in part as follows:

> The licensee [Seattle City Light] shall interpose no objections to and shall in no way prevent the use of . . . the reservoirs and project area for boating, fishing and other recreational purposes by the public when and to the extent that such public use does not directly interfere with power use.

Exhibit 1. The license also requires Seattle City Light to construct and maintain a roadway across Diablo Dam. Seattle City Light does not charge a fee to the public for the use of this property.

The road across the dam runs basically in a north–south direction. The road has parallel tracks, approximately 5 feet apart, running along the east side of the roadway, that is, on the right–hand side as one crosses the dam from south to north. Each track has a groove adjacent to it approximately 2½ inches in width, which allows the wheels of a "mule" to run along the track.[1]

Gaeta was crossing the dam from south to north on his motorcycle. He did not notice the tracks until he found himself on his motorcycle between the set of tracks on top of the dam. His motorcycle traveled between the tracks at approximately 10 m.p.h. for at least 60 yards. As Gaeta traveled along the roadway between the tracks, he became apprehensive of the potential danger posed by the tracks. He felt that they were dangerous because they were slippery. He then decided to cross the tracks by swinging out to his right and back to his left across the westernmost track. As he did so, a wheel of his motorcycle jammed in the

---

[1]A "mule" is a device for raising the floodgates, and it travels on tracks for precise location over the top of the gates.

groove next to the track, causing him to fall and sustain personal injuries.

Gaeta filed a complaint against Seattle City Light for failing to warn him about the tracks. The trial court granted Seattle City Light's motion to dismiss at the close of Gaeta's case. In ruling on this motion, the court concluded that the protection afforded by the Washington recreational use statute was applicable to Seattle City Light's road. The court also concluded that the ruts or grooves adjacent to the tracks on the top surface of Diablo Dam did not constitute a known, dangerous, artificial, latent condition.

To support his motion for reconsideration, Gaeta offered newly discovered evidence in the form of a photograph of a sign up and in place at Coulee Dam warning of the hazard of an exposed crane rail. This evidence was offered to contradict testimony of Seattle City Light's witness, Newby, who had testified that he had toured Coulee Dam and no such warning sign was present. The trial court denied Gaeta's motion for reconsideration. This appeal timely followed.

### APPLICABILITY OF THE RECREATIONAL USE STATUTE

The Washington recreational use act, RCW 4.24.210, provides in part as follows:

> Any public or private landowners or others in lawful possession and control of any lands . . . who allow members of the public to use them for the purposes of outdoor recreation, which term includes, but is not limited to . . . pleasure driving of . . . vehicles, . . . viewing or enjoying . . . scenic . . . sights, without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users: . . . *Provided further,* That nothing in this section shall prevent the liability of such a landowner or others in lawful possession and control for injuries sustained to users by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted . . .

The purpose of RCW 4.24.210

is to encourage owners or others in lawful possession and control of land and water areas or channels to make them available to the public for recreational purposes by limiting their liability toward persons entering thereon and toward persons who may be injured or otherwise damaged by the acts or omissions of persons entering thereon.

RCW 4.24.200.

In *Jones v. United States,* 693 F.2d 1299 (9th Cir. 1982), plaintiff Lisa was injured while inner tubing on forest land owned by the United States. She argued that the government received a "fee" for her use of the park because she paid National Park Concessions, Inc., (NPC), a dollar to rent an inner tube. *Jones,* at 1303. NPC pays the government a fixed rental and a percentage of its gross receipts. The trial court held that the fee was charged for the use of the inner tube and was not a fee charged for the use of the land. The appellate court agreed, reasoning that Lisa entered the park without paying a fee and could use any area of the park without payment if she brought her own tube. *Jones v. United States, supra* at 1303.

Similarly, Seattle City Light does not engage in any commercial activities with the public at Diablo Dam. Although there is a resort located on the reservoir and the resort engages in commercial activities, Seattle City Light has no business interest in those activities. Gaeta was free to use the Diablo Dam land, regardless of whether he made any purchases at the resort.

Gaeta argues that because the United States government compelled Seattle City Light to open up the Diablo Dam area to the public for recreational purposes, it does not come within the operation of the statute. We find that if a person in lawful possession and control of lands allows the public to use them for recreational purposes without charging a fee, the recreational use statute applies.

It is of no consequence that there may be a lease or franchise provision requiring the occupier to open the lands to the public.

Gaeta cites *Smith v. Southern Pac. Transp. Co.*, 467 So. 2d 70 (La. Ct. App. 1985) in support of his argument that a roadway which can be put to nonrecreational use loses the protection of the recreational use act. The plaintiff, Smith, was a professional truck driver driving down Hospital Drive through City Park when his truck hit the bottom of a railroad overpass. Both the trial court and the Court of Appeals of Louisiana treated Hospital Drive as a public highway and held that the City of New Orleans breached its duty to Smith by failing to warn him of the low clearance. In addition, the appellate court noted that the City was raising the defense of the Louisiana recreational use statute for the first time on appeal. The court rejected this defense, stating that Smith was not using Hospital Drive for recreational purposes.

*Smith* may be distinguished from the case at bar. Smith was a professional truck driver driving a large truck through downtown New Orleans on a thoroughfare which happens to cut through City Park for a portion of its length. The roadway was built and maintained primarily for commercial use, as opposed to recreational. On the other hand, Gaeta was riding his motorcycle on a cross–country tour and turned off the main highway onto the Diablo Dam roadway. The Diablo Dam roadway is not a thoroughfare, but leads only to the reservoir and abutting lands left open by Seattle City Light to the public for recreational use.

Gaeta next argues that the recreational use act does not apply because his sole purpose in using the Diablo Dam roadway was commercial, to reach the resort where he could purchase some gasoline for his motorcycle.

 We find the proper approach in deciding whether or not the recreational use act applies is to view it from the standpoint of the landowner or occupier. If he has brought

himself within the terms of the statute, then it is not significant that a person coming onto the property may have some commercial purpose in mind. By opening up the lands for recreational use without a fee, City Light has brought itself under the protection of the immunity statute, and it therefore is immaterial that Gaeta may have driven across the dam in search of gasoline at the resort.

Accordingly, we find that the recreational use act applies to the City Light properties involved in this case.

### KNOWN, DANGEROUS, ARTIFICIAL, LATENT CONDITION

Gaeta next argues that the tracks were a known, dangerous, artificial, latent condition for which warning signs had not been conspicuously posted.

The recreational use statute does not limit a landowner's liability when injuries are sustained "by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted". RCW 4.24-.210. In order to constitute a "known" dangerous condition for purposes of the recreational use act, the landowner must have actual as opposed to constructive knowledge that a condition is dangerous. *Morgan v. United States,* 709 F.2d 580, 583–84 (9th Cir. 1983). "Dangerous" is not defined, but at the very least, should be defined in terms of common law negligence, namely, a condition that poses an unreasonable risk of harm. W. Prosser, *Torts* § 31 (4th ed. 1971). To define "dangerous" as meaning any lesser hazard would operate to increase the potential liability of the landowner. This would be contrary to the stated purpose of the statute. A latent condition is one which is not readily apparent to the recreational user. *Preston v. Pierce Cy.,* 48 Wn. App. 887, 892, 741 P.2d 71 (1987) (citing *Morgan v. United States, supra*).

In *Preston v. Pierce Cy., supra,* a juvenile who was injured when his foot slipped into the exposed moving parts of a merry–go–round sued the County that maintained the device. The County pleaded as its defense the Washington

recreational use statute. The trial court granted the County's motion for summary judgment. The issues on appeal concerned whether the County knew of the dangerous condition, whether it was latent, and whether warning signs were adequate.

With regard to actual knowledge, the evidence showed that maintenance workers knew that the moving parts had been exposed approximately 1 week before the accident occurred. With regard to the latency of the defect, the *Preston* court adopted the definition set forth in *Morgan* that "latent" refers to "'a condition not readily apparent to the recreational user.'" *Preston v. Pierce Cy., supra* at 892 (quoting *Morgan v. United States, supra* at 583). The evidence presented to the trial court indicated that although the internal mechanism was visible, the dangerousness of its exposure was latent as to the recreational user. *Preston v. Pierce Cy., supra* at 892–93.

Finally, the *Preston* court determined that the signs posted were not sufficiently conspicuous. The *Preston* court held that material issues of fact existed sufficient to rebut the County's motion for summary judgment, requiring reversal and remand for trial. *Preston v. Pierce Cy., supra* at 893.

*Preston* appears to have been decided on the basis that while the merry–go–round's internal mechanism was clearly visible and was a patent condition, "its injury causing aspects" were not readily apparent and were therefore latent. *Preston,* at 893. In other words, the court incorrectly applied latent to the term "dangerous". We believe the statute properly interpreted would apply the term "latent" to the condition, which in this case would be the tracks for the "mule". As the statute is written, the condition must be known, dangerous, artificial and latent. The condition here was not latent because the tracks were obvious and was not dangerous because the tracks did not pose an unreasonable risk of harm.

Gaeta next argues that because Newby testified that he was looking for signs at the Coulee Dam, which had similar tracks, there is sufficient evidence regarding the actual knowledge of Seattle City Light to submit the issue to the jury. Because we find the condition was not latent or dangerous, we need not address this issue.

Gaeta finally argues that the trial court erred in denying his motion to reconsider because the photo of the warning sign at Coulee Dam directly contradicts the testimony of Seattle City Light's witness on the issue of whether the artificial condition was known. Because we find the condition was not latent and was not dangerous, evidence of the sign at Coulee Dam is immaterial.

Judgment affirmed.

WINSOR, J., concurs.

PEKELIS, J. (concurring)—I concur in the result, but disagree with the majority's conclusion that the *Preston* court applied "latent" to the term "dangerous" instead of to the term "condition." The problem is in determining what the statutory term "condition" should encompass. The definition of latent, that is, "'a condition not readily apparent to the recreational user", *Preston,* 48 Wn. App. at 892 (quoting *Morgan v. United States,* 709 F.2d 580, 583 (9th Cir. 1983)), implicates the injury causing aspects of a "thing" and not simply the "thing" itself. This is particularly true in circumstances such as those in *Preston* where the question was whether the defect of a child's plaything was readily apparent. It would have been far too limiting to equate the merry–go–round's internal mechanism with the "condition" and conclude that simply because it was visible, the condition was not latent. In short, I have absolutely no quarrel with the *Preston* court's application of the term "latent."

Nevertheless, under either interpretation of "latent," the majority's holding is the correct one. Here, whether the "condition" is considered to be the tracks themselves or

their injury causing aspect, the condition was clearly not latent.

Review denied at 113 Wn.2d 1020 (1989).