[No. 65945-1. En Banc.]

Argued June 17, 1998. Decided December 24, 1998.

ROBERT RAVENSCROFT, ET AL., *Petitioners*, v. THE
WASHINGTON WATER POWER CO., ET AL., *Respondents*.

912

Madsen, J., Durham, C.J., and Talmadge, J., dissent by separate opinion.

*James F. Combo*, for petitioners.

*Paine, Hamblen, Coffin, Brooke & Miller*, by *Donald G. Stone* and *Mary M. Palmer*; and *Evans, Craven & Lackie, P.S.*, by *Hugh T. Lackie* and *Amy C. Clemmons*, for respondents.

*Debra L. Stephens, Gary N. Bloom*, and *Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association, amicus curiae.

Guy, J. — In this case we are asked to decide whether one of several submerged, rooted tree stumps near the middle of a water channel in a dam reservoir is an "artificial" and "latent" condition under the exception to the recreational use statute, and whether the public duty doctrine bars a claim for injuries allegedly caused by a county's failure to warn boaters of submerged tree stumps. We hold that the injury-causing condition in this case was one of several submerged tree stumps which the defendant left near the middle of a water channel whose water level

is controlled by defendant; that this condition is artificial, as a matter of law; and whether this condition is latent is a question for the trier of fact. We also hold that the public duty doctrine bars the plaintiffs' claims against the County.

## FACTS

On June 24, 1990, Robert Ravenscroft was severely and permanently injured when the boat in which he was riding struck a submerged, rooted tree stump. When the boat hit the stump, the outboard motor broke off from its attachment and flipped into the boat, striking Mr. Ravenscroft on the head and shoulder.

The accident occurred on an area of the Spokane River, commonly called Long Lake, which was created by the Washington Water Power Company (WWP). Spokane County (County) is responsible for regulating boating safety on the lake. Mr. Ravenscroft[1] sued both the County and WWP for his injuries.

WWP owns and operates the Spokane River Hydroelectric Project pursuant to a Federal Power Commission license. The license agreement requires WWP to make the project area available for recreational use without charging a fee. The project extends several miles along the Spokane River between Upper Falls Dam and Long Lake Dam and includes Nine Mile Falls Dam. The Long Lake portion of the project consists of a reservoir with a normal pool elevation of 1,536 feet, extending about 24 miles upstream, and having an area of about 5,060 acres.

The Nine Mile Falls Dam is upstream from the area where Mr. Ravenscroft was injured. WWP has owned the Nine Mile Falls Dam since 1925. Nine Mile Falls Dam is a "run of the river" dam, which means that, with high water, water naturally flows over the dam.

Long Lake Dam was constructed in 1910 and initially had a maximum pool elevation of substantially less than its

[1]Mr. Ravenscroft's wife and child also are plaintiffs in the action. The plaintiffs are referred to collectively herein as Mr. Ravenscroft.

present level. In order to increase power production, WWP has raised the level of the Long Lake reservoir over the years. Mr. Ravenscroft's accident occurred in an area where trees once stood, bordering the bank of the Spokane River. When WWP raised the elevation of Long Lake reservoir, the trees became surrounded by water and were near the middle of the water channel. Gradually the trees died, but many of the snags remained, standing above the water for many years. WWP eventually had the trees cut and snags removed but left a number of tree stumps. The stumps cannot lawfully be removed at this time because removal now would disrupt fish and other natural habitat. Throughout the boating season, WWP maintains the level of the reservoir at its maximum of 1,536 feet. When the pool is held at maximum level, the tops of the tree stumps are below the water surface.

On June 24, 1990, the stumps were submerged. The driver of the boat in which Mr. Ravenscroft was a passenger testified by affidavit that he had never been to Long Lake reservoir before the day of the accident. At the Long Lake public boat launch he observed the waterway and noticed the river appeared very wide and calm, although somewhat murky. He saw no floating debris or stumps of any kind in the water near the dock nor in the water downstream toward the main body of Long Lake. He states he saw nothing that would indicate the presence of any submerged objects or hazards in the direction he was traveling. He states he took the same route he saw other boats taking and stayed in the middle of the water channel. As he proceeded downstream, almost in the middle of the channel of water, the boat began to plane. He then heard a loud bang and the motor died. He turned around and saw that the outboard motor had flipped up into the boat.

The area where the accident occurred is within the boundary of Riverside State Park, which is owned and operated by the Washington State Parks and Recreation Commission. The Commission does not manage the waterways which run through the park but, instead, has authorized

the Marine Division of the Spokane County Sheriff's Department to control the waterways and govern any safety measures applicable to those waterways. The County regulates the waters of all lakes and rivers within Spokane County. The County has been patrolling the waters of the Spokane River, including Long Lake, enforcing safety measures, since the 1940s or '50s. The functions of the County's patrol program include public education about boating safety, and waterway marking by placement of buoys where hazards exist.

One year before Mr. Ravenscroft's accident, in 1989, the State Parks and Recreation Commission and the County entered into a Cooperative Agreement for promoting boating safety. In applying for participation in the agreement, the County stated that its proposed boating safety program would include placing buoys in hazardous locations and in areas of high boat traffic or potentially high accident/incident areas. No buoy marked the area of the accident on June 24, 1990.

Mr. Ravenscroft filed suit against WWP and the County, alleging negligence and breach of statutory duties on the part of each defendant.

Both defendants moved for summary judgment. WWP and the County each claimed that it was immune from liability under Washington's recreational use statute, RCW 4.24.200-.210. The trial court denied WWP's motion, ruling that the "known dangerous artificial latent condition" exception to recreational use immunity may apply in this case because the condition which injured Mr. Ravenscroft was known, dangerous, and was artificial as a matter of law. The trial court ruled that whether the condition was "latent" was a question of fact for the jury. The trial court also denied the County's motion, ruling that the County was not an owner or entity in lawful possession and control of the property and, therefore, as a matter of law, was not entitled to the protection of the statute.

Spokane County then moved for summary judgment on the basis of the public duty doctrine. The County argued

that Mr. Ravenscroft's statutory, common law and contract claims against it were barred by the public duty doctrine. This summary judgment motion was granted in part and denied in part. The trial court granted summary judgment of dismissal on Mr. Ravenscroft's premises liability claims, ruling there were no grounds for these claims as the County was not an owner or otherwise in control of the premises. The trial court then denied the motion for summary judgment with respect to the public duty doctrine because it determined issues of fact existed with respect to whether the "failure to enforce" or "legislative intent" exceptions to the doctrine applied. The trial court also determined that an issue of fact existed with respect to whether Mr. Ravenscroft was a third party beneficiary to the Cooperative Agreement between the County and the State Parks and Recreation Commission.

All parties moved for discretionary review in the Court of Appeals. The Court of Appeals reversed the trial court's rulings on the issues relating to the recreational use statute and public duty doctrine, affirmed the trial court's ruling on the premises liability claims, and remanded for dismissal of all of Mr. Ravenscroft's claims. *Ravenscroft v. Washington Water Power Co.*, 87 Wn. App. 402, 942 P.2d 991 (1997), *review granted*, 134 Wn.2d 1018 (1998). Mr. Ravenscroft petitioned for review, which this court granted. The Washington State Trial Lawyers Association was permitted to file an amicus brief.

## ISSUES

1. Is a submerged, rooted tree stump, located in a channel of water which is part of a dam reservoir, an "artificial" and "latent" condition, as a matter of law, under the recreational use statute?

2. Should this court remand for a determination of whether the County was an owner or possessor of land under the recreational use statute?

3. Does the public duty doctrine bar an action for dam-

ages for personal injuries allegedly caused by the County's failure to perform water safety duties delineated in a contract with the State?

## DISCUSSION

In reviewing a summary judgment order, this court engages in the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982); *Chamberlain v. Department of Transp.*, 79 Wn. App. 212, 215, 901 P.2d 344 (1995). A summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996). The facts and all reasonable inferences therefrom must be construed in the light most favorable to the nonmoving party. *Degel*, 129 Wn.2d at 48; *Riksem v. City of Seattle*, 47 Wn. App. 506, 508-09, 736 P.2d 275 (1987).

## Recreational Use Statute

Washington's recreational use statute, RCW 4.24.210, currently provides, in pertinent part:[2]

> (1) Except as otherwise provided in subsection (3) of this section, any public or private landowners or others in lawful possession and control of any lands . . . or water areas or channels and lands adjacent to such areas or channels, who allow members of the public to use them for the purposes of outdoor recreation, which term includes . . . boating . . . without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users.

---

[2]The former version of the statute has been amended four times since June 24, 1990, the date of the accident in this case. Laws of 1991, ch. 50, § 1; Laws of 1991, ch. 69, § 1; Laws of 1992, ch. 52, § 1; Laws of 1997, ch. 26, § 1. None of the amendments substantively changes the portions of the law which apply to this case, and the current version of the statute contains the same exception that was effective in the summer of 1990.

. . . .

> (3) . . . Nothing in this section shall prevent the liability of such a landowner or others in lawful possession and control for injuries sustained to users by reason of a *known dangerous artificial latent condition* for which warning signs have not been conspicuously posted . . . .

(Emphasis added.)

■ This court has held that each of the words—"known," "dangerous," "artificial," and "latent"—modifies "condition." *Van Dinter v. City of Kennewick*, 121 Wn.2d 38, 46, 846 P.2d 522 (1993). And each must be present before a landowner's duty to post a warning arises. *Tabak v. State*, 73 Wn. App. 691, 695, 870 P.2d 1014 (1994). The issues involved in this appeal are whether the injury-causing condition was "artificial" and whether it was "latent."[3]

This court has not yet had an opportunity to interpret the meaning of "artificial condition" as that term is used in RCW 4.24.210. We have, however, considered the meaning of "latent condition" as applied to a condition which is obviously artificial. *Van Dinter*, 121 Wn.2d 38 (caterpillar climbing toy).

We first turn our consideration to whether the condition which caused the injury in this case is "artificial" under the statute.

■ In construing a statute, this court's primary goal is to ascertain and give effect to the legislative intent. *Bernstein v. State*, 53 Wn. App. 456, 460, 767 P.2d 958 (1989); *Rozner v. City of Bellevue*, 116 Wn.2d 342, 347, 804 P.2d 24 (1991). If a statute is unambiguous, the meaning of the statute is to be derived from the language used in the statute itself. *Bernstein*, 53 Wn. App. at 460. The fact that a word is not defined in a statute does not mean the statute is ambiguous. Rather, an undefined term should be given

---

[3]Whether WWP had knowledge of the condition is not before this court, and we assume for purposes of summary judgment that it did.

its plain and ordinary meaning unless a contrary legislative intent is indicated. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 813, 828 P.2d 549 (1992).

The purpose of the recreational use statute is to "encourage owners or others in lawful possession and control of land and water areas or channels to make them available to the public for recreational purposes." RCW 4.24.200. *See also Ochampaugh v. City of Seattle*, 91 Wn.2d 514, 523, 588 P.2d 1351 (1979) (it is apparent that this statute was enacted because of a greatly expanding need and demand for outdoor recreational opportunities). This is done by limiting the landowner's liability toward recreational users, subject to limited exceptions. *Riksem*, 47 Wn. App. at 510.

We want to make clear that the statute does not limit its grant of immunity to owners of "natural" bodies of water or of land that remains only in its "natural" state. *See* RCW 4.24.210(1) ("landowners or others in lawful possession and control of *any* lands . . . or water areas or channels" (emphasis added)). *See also Riksem*, 47 Wn. App. 506 (recreational use statute applies to paths and trails); *Chamberlain*, 79 Wn. App. 212 (statute applies to a bridge associated with land area). The recreational use statute limits the liability of owners and possessors of land or water, without regard to whether the body of water or land area remains in its primeval state.

An exception to this grant of immunity exists when a condition on the land or in the water is dangerous, is known to the owner or possessor, is artificial, and is latent. The "condition" examined here is not simply a reservoir. The condition is the specific object or instrumentality that caused the injury, viewed in relation to other external circumstances in which the instrumentality is situated or operates. *Van Dinter*, 121 Wn.2d at 43. The specific object causing the injury in this case was a tree stump. Under *Van Dinter*, the stump must be viewed in relation to other external circumstances, such as the location of the stump in the water channel and the water level, when considering

whether the "condition" is known dangerous artificial and latent.

Artificial Condition

The statute does not define artificial. Mr. Ravenscroft argues that we should hold the meaning of "artificial" as used in the recreational use statute to be the dictionary definition of the word. Courts often look to standard dictionaries to determine the ordinary meaning of words, *Gerberding v. Munro*, 134 Wn.2d 188, 199, 949 P.2d 1366 (1998); *Washington State Coalition for the Homeless v. Department of Soc. & Health Servs.*, 133 Wn.2d 894, 905, 949 P.2d 1291 (1997), and we do so in this case. The dictionary defines "artificial" as follows:

> 1: contrived through human art or effort and not by natural causes detached from human agency : relating to human direction or effect in contrast to nature: (a) : formed or established by man's efforts, not by nature[.]

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 124 (1986).

Mr. Ravenscroft argues that the injury-causing condition in this case was created by man—from flooding the river bank, to cutting the trees, then leaving the stumps in the middle of the channel, and controlling the level of the water. Mr. Ravenscroft argues the condition is, therefore, artificial.

WWP counters that to classify any natural condition changed by man as "artificial" would be contrary to the statute's purpose of making recreational areas available to the public, because it would effectively make all waterways artificial. WWP's argument is based on the erroneous assumption that the owner of an artificial waterway does not have the protection of the recreational use statute.

The question here is not whether the statute's limitation on liability applies to artificially created recreation areas, or even to artificial structures located on natural areas. It does. By its terms and under judicial interpretation, the statute's limitation on liability applies to many areas that do not remain in a completely natural state. For example,

the statute has been held to apply to a gravel mound on an excavation site, *Tennyson v. Plum Creek Timber Co.*, 73 Wn. App. 550, 872 P.2d 524 (1994); to tracks on a roadway crossing the top of a dam, *Gaeta v. Seattle City Light*, 54 Wn. App. 603, 774 P.2d 1255 (1989); to a logging road in the woods, *Widman v. Johnson*, 81 Wn. App. 110, 912 P.2d 1095 (1996); to the Burke-Gilman Trail, a mixed-use trail through parts of Seattle, *Riksem*, 47 Wn. App. 506; and to a scenic overlook bridge on Deception Pass, *Chamberlain*, 79 Wn. App. 212. In the present case there is no question that Long Lake reservoir is an area which is within the scope of the protections afforded under the recreational use statute.

The issue in the present case is whether the exception to the statute applies to the particular condition which caused the accident. The focus here is whether the injury-causing condition is artificial.

 A tree stump, on its own, may be no more artificial than a large rock. The determination of whether a condition is dangerous, artificial and latent is often fact specific. In this case, it is the *man-made change* in the natural condition of the water channel that created an artificial condition. The natural water channel was enlarged artificially, causing natural objects to become submerged and potentially dangerous to water users. This man-created water course, containing a submerged line of tree stumps, was not configured by nature but by man.[4]

The injury-causing condition was created by WWP cutting down trees, leaving stumps near the middle of a water channel, then raising the river to a level which covered the stumps. This condition was contrived through human ef-

---

[4]WWP argues that the record does not demonstrate which particular tree stump caused the accident or whether the stump which caused Mr. Ravenscroft's injuries was cut or was broken off by some other means. Therefore, WWP argues, a question of fact exists which may not be decided on summary judgment. We note that WWP does not contest that the accident was caused by one of several submerged tree stumps in the middle of the water channel. It was not the stump, alone, but the stump, as part of the man-made condition of the water channel, that caused the injury.

fort, not by natural causes detached from human effort. The condition was therefore artificial.

WWP argues that if the stump involved in Mr. Ravenscroft's accident is determined to be an artificial condition, then owners and others in possession of recreational property will be required to warn of the presence of every rooted stump, rock, sandbar, or other accumulated debris common to the natural topography. This, it claims, would be contrary to the legislative purpose of making lands and waterways available for recreational use.

■■■ While we agree the primary intent of the recreational use statute is to encourage landowners to make lands and waterways available for recreational users, the statute also evidences a legislative intent to withhold immunity from landowners who know of a condition which is dangerous, hidden and artificial. Where such a condition exists and the landowner knows of its existence, the Legislature intended the landowner have a duty to warn of the dangerous condition. We do not view this as an onerous duty. The duty to warn does not require a landowner to post a sign on every stump. However, where a dangerous condition is not obvious to recreational users, the landowner must warn that the hazardous condition exists so that a recreational user might avoid injury.[5]

Latent Condition

■■■ "Latent" as used in RCW 4.24.210 means "not readily apparent to the recreational user." *Van Dinter,* 121 Wn.2d at 45; *Gaeta,* 54 Wn. App. at 609. The condition itself, not the danger it poses, must be latent. *Chamberlain,* 79 Wn. App. at 219. The dispositive question is whether the condition is readily apparent to the general class of recreational users, not whether one user might fail to discover it. *Chamberlain,* 79 Wn. App. at 219; *Tennyson,* 73 Wn. App. at 555.

Under a traditional common law premises liability analy-

---

[5]At oral argument in this case, the parties agreed that the row of submerged stumps has now been marked by buoys to warn boaters of the hazard.

sis, the court determines whether the *danger* or *risk* associated with a body of water is obvious, or open and apparent. *See Swanson v. McKain*, 59 Wn. App. 303, 311, 796 P.2d 1291 (1990). However, under the recreational use statute, the question is whether the *injury-causing condition*—not the specific risk it poses—is readily apparent to the ordinary recreational user. *Van Dinter*, 121 Wn.2d at 46.

In *Van Dinter*, this court held that the caterpillar toy "as well as its injury-causing aspect—its proximity to the grassy area—were obvious. The condition that caused Van Dinter's injury was not latent." *Van Dinter*, 121 Wn.2d at 46. The Court of Appeals cases generally are in accord.

- In *Widman*, the court held that the intersection of a logging road and a state highway is readily apparent to the general class of recreational users. *Widman*, 81 Wn. App. at 115.

- In *Chamberlain*, the court held that the proximity of a walkway to vehicular traffic on the scenic overlook bridge was an obvious condition and therefore not latent. *Chamberlain*, 79 Wn. App. at 219-20.

- In *Tennyson*, the court held that excavation of a gravel mound "was in plain view and readily apparent to anyone who examined the gravel mound as a whole;" the particular recreational user's failure to discover the condition had no bearing on whether the condition was latent. *Tennyson*, 73 Wn. App. at 555-56.

- In *Gaeta*, the court held the condition was not latent because the tracks across the top of the dam "were obvious." *Gaeta*, 54 Wn. App. at 610.

- In *Riksem*, the court held the nature of a trail used by joggers, pedestrians and cyclists was obvious from viewing the trail and that the mixed-use condition was, therefore, not latent. *Riksem*, 47 Wn. App. at 511.

In this case, the driver of the boat testified by affidavit that the submerged stumps were not apparent to him. Other witnesses filed affidavits stating that other boats had hit the stumps, indicating they were not readily apparent.

■■■ The record does not support a conclusion that the submerged stumps near the middle of the channel were obvious or visible as a matter of law. The question of whether this particular condition is latent is one of fact and, therefore, an order of summary judgment is not appropriate on that issue.

### Application of Recreational Use Statute to County

Mr. Ravenscroft's claims against the County were based, in part, on common law premises liability and negligence theories. The trial court determined that the evidence could not support a conclusion that the County was an owner, or possessor in control, of the property. Based on this conclusion, the trial court ruled that the immunity granted in the recreational use statute was not available to the County and also ruled that Mr. Ravenscroft was unable to support his premises liability claims.

In his petition for review, Mr. Ravenscroft asks this court to remand this case to the trial court, in part, to determine "whether the County was a possessor of land in order to determine the nature of any duty that arose under the recreational use statute." Pet. for Review at 18. The County argues that this issue is not properly before the court as it was not raised by Mr. Ravenscroft in the Court of Appeals.

In its first motion for summary judgment, the County argued that the claims against it should be dismissed because the "County is considered an owner under the Recreational Use Statute." Clerk's Papers at 18. The trial court denied summary judgment and, after reviewing the facts and arguments before it, stated in its memorandum opinion that "the county neither owns nor operates nor controls the river or Long Lake. Therefore . . . Spokane County is not an entity that would have the protection of RCW 4.24.210." Report of Proceedings at 66.

In a subsequent motion for summary judgment on the other claims, the trial court dismissed all of Mr. Ravenscroft's common law premises liability claims after finding

that "there are no grounds for Plaintiffs' common law causes of action against Spokane County." Clerk's Papers at 406. The trial court stated that the issue was partially resolved in the first summary judgment decision where the court found that the County did not have sufficient control over the lake to take advantage of the recreational use statute. The trial court then determined that the County did not have sufficient control over the property to be liable under common law principles pertaining to premises liability.

In his brief before the Court of Appeals, Mr. Ravenscroft sought review of the trial court's ruling on his common law premises liability claims. The issue now raised by Mr. Ravenscroft—whether the County is a "possessor" of land under the recreational use statute—is not properly before the court, and we decline to review it.

■■ ■■ Regardless of the procedural flaw in this court, Mr. Ravenscroft presents no reference to any fact that would support his position on this issue. Although the record shows the County had responsibility for boating safety and for marking hazards on all waterways in Spokane County, that responsibility does not result in ownership or possession and control of the property as required by the recreational use statute, RCW 4.24.210. If the County is not an owner or possessor or in control of the property for purposes of the recreational use statute, then it is not an owner or possessor under the common law and cannot be liable under a premises liability theory. However, the County may have statutory or regulatory duties toward recreational boaters. Such duties may be the basis of liability, subject to application of the public duty doctrine.

## Public Duty Doctrine

Plaintiff Ravenscroft initially argued to the trial court and to the Court of Appeals that the County was liable for his injuries, based on the County's failure to comply with statutory and regulatory duties. He also claimed that he

was a third-party beneficiary of a funding agreement between the County and the State Parks and Recreation Commission. The trial court denied the County's motion for summary judgment of dismissal of these claims, ruling that questions of fact existed which precluded summary judgment. The Court of Appeals reversed the trial court on the statute-based claims, holding that application of the public duty doctrine barred the claims. The Court of Appeals then held that even if Mr. Ravenscroft were a third-party beneficiary of the State-County agreement, his claim sounded in tort and, likewise, was barred by the public duty doctrine as a matter of law. *Ravenscroft*, 87 Wn. App. at 416-17.

In his petition for review to this court, Mr. Ravenscroft challenges only the Court of Appeals conclusion that the public duty doctrine bars his third-party beneficiary claim. Mr. Ravenscroft does not challenge the Court of Appeals holding that the public duty doctrine applies to a negligence action based on failure to perform contractual duties, if a duty exists independent of the contract. *Ravenscroft*, 87 Wn. App. at 417 (citing *American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 230, 797 P.2d 477 (1990)). Instead, he argues that an exception, similar to the legislative intent exception to the public duty doctrine, applies in his case.[6]

This court explained the public duty doctrine in *Honcoop v. State*, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988), as follows:

It is axiomatic that to maintain a negligence action a duty

---

[6]In its amicus curiae brief, the Washington State Trial Lawyers Association (WSTLA) discusses the application of the "failure to enforce" exception to the public duty doctrine. Mr. Ravenscroft, in response to WSTLA's brief, discusses this exception. However, Mr. Ravenscroft did not raise the issue in his petition for review, and the County has not had an opportunity to respond to the arguments set forth in Mr. Ravenscroft's brief in reply to the brief of amicus curiae. Because the issue was not accepted for review, we do not consider it. RAP 13.7(b) (Supreme Court will review only the questions raised in the petition for review and the answer); *Atherton Condominium Apartment-Owners Ass'n v. Blume Dev. Co.*, 115 Wn.2d 506, 530-31 n.16, 799 P.2d 250 (1990). *See also Noble Manor Co. v. Pierce County*, 133 Wn.2d 269, 272 n.1, 943 P.2d 1378 (1997) (appellate courts will not usually decide an issue raised only by amicus).

of care running from the defendant to the plaintiff must be shown. Where the liability of a governmental entity is at issue, we have employed the "public duty doctrine" to determine whether the duty is one owed to a nebulous public or whether that duty is owed to a particular individual. The public duty doctrine provides that regulatory statutes impose a duty on public officials which is owed to the public as a whole, and that such a statute does not impose any actionable duty that is owed to a particular individual. *Bailey v. Forks*, 108 Wn.2d 262, 265-66, 737 P.2d 1257 (1987); *Chambers-Castanes v. King Cy.*, 100 Wn.2d 275, 284, 669 P.2d 451, 39 A.L.R.4th 671 (1983).

■ The public duty doctrine does not bar a plaintiff's action if a regulatory statute, by its terms, evidences a clear legislative intent to identify and protect a particular and circumscribed class of persons. In such a case, a member of the identified class may bring a tort action against the governmental entity for its violation of the statute. *Honcoop*, 111 Wn.2d at 188. This exception to the public duty doctrine is referred to as the "legislative intent exception."

■ The Court of Appeals held that the legislative intent exception did not apply in this case because the statutes and regulations which refer to recreational boaters, *see*, *e.g.*, WAC 352-65 (boating safety programs); WAC 352-66 (Uniform Water Marking System), are primarily aimed at protecting the public, not just members of a particular class of the public who participate in recreational boating. *Ravenscroft*, 87 Wn. App. at 415. With respect to the State-County agreement, the Court of Appeals held that the agreement itself did not impose a duty upon the County. The County's responsibilities toward recreational boaters are set forth in the statutes and regulations. The agreement merely provided funding from the State Parks and Recreation Commission to support the County in meeting its responsibilities. It did not create new obligations. *Ravenscroft*, 87 Wn. App. at 417. We agree with the Court of Appeals.

The agreement between the State Parks and Recreation

Commission and the County was made pursuant to the state boating safety grants and contracts program. *See* WAC 352-64; RCW 43.51.400. The term of the agreement was from April 21, 1989 to March 31, 1990, and it provided for reimbursement of matching funds, to a maximum of $9,500, for costs involved in implementing the County's biennial boating safety program. One of the goals of the County's program was to "[p]lace buoys . . . in hazardous locations and areas of high boat traffic or potentially high accident/incident areas." Clerk's Papers at 637. Mr. Ravenscroft argues that the agreement defines the duties of the County toward recreational boaters as a specific class apart from the public at large.

In order for the legislative intent exception to apply, the regulation establishing a duty must intend to identify and protect a particular and circumscribed class of persons, and this intent must be clearly expressed within the provision—it will not be implied. *Baerlein v. State*, 92 Wn.2d 229, 232, 595 P.2d 930 (1979); *Johnson v. State*, 77 Wn. App. 934, 938, 894 P.2d 1366 (1995).

In the agreement between the County and the Commission and the statutes and regulations to which it refers, there is no express intent to protect the particular and circumscribed class of recreational boaters. This court will not imply that intent.

In *Johnson*, 77 Wn.2d at 938, the Court of Appeals held that statutes and regulations establishing a campus police force and requiring first-year college students to live in student housing was not intended to identify and protect plaintiff as a member of the Washington State University student body. In *Baerlein*, 92 Wn.2d at 233, this court held that the state securities act was not intended to protect individual investors but only the investing public. In *Taylor v. Stevens County*, 111 Wn.2d 159, 166, 759 P.2d 447 (1988), this court held the state building code act was intended to protect the general public, not the specific class of building occupants. And in *Honcoop*, 111 Wn.2d at 188-89, the court held that statutes and regulations enacted to prevent the

spread of brucellosis, a disease of cattle, were intended to protect the general public, not the specific class of dairy operators. Like the regulations and statutes in these cases, the agreement examined here provides no clear expression that it was intended to apply to a specific class of recreational boaters "in addition to the general public." *See Taylor*, 111 Wn.2d at 166.

Additionally, while the agreement sets forth the County's goals and objectives in accomplishing its county-wide boating safety program, it does not create obligations. The statutes and regulations governing water safety, WAC 352--65, WAC 352-66, RCW 43.51.400, not the agreement, establish the duty to promote boating safety. It does not appear, in the agreement, that the County agreed to assume obligations beyond those already existing in statutory and tort law. Instead, the agreement identified the County's goals and plans for promoting boating safety.

Because the third-party beneficiary claim is based on negligent acts or omissions, this claim is subject to the public duty doctrine. The underlying contract on which the claim is based does not create responsibilities for safety of recreational boaters as a specific class.

## CONCLUSION

We hold that a submerged, rooted tree stump, which is one of several stumps left near the middle of a water channel when the width of the channel was increased by human effort, is, as a matter of law, an "artificial condition" under the recreational use statute. Whether this condition was latent at the time of the accident is a question for the trier of fact. We decline to review Mr. Ravenscroft's request to remand for a factual determination of the County's status as a possessor of land under the recreational use statute. We hold the third party beneficiary claim under the Cooperative Agreement is barred under the public duty doctrine.

Affirmed in part, reversed in part, and remanded to the trial court for further proceedings.

DOLLIVER, SMITH, JOHNSON, ALEXANDER, and SANDERS, JJ., concur.

MADSEN, J. (dissenting) — Resolution of this case turns on whether a submerged tree stump constitutes an artificial and latent condition. Because two natural conditions, readily ascertained by a recreational user, cannot combine to make one artificial condition, I respectfully dissent from the majority's holding that the submerged tree stump was an artificial condition.

The majority's first error is adopting a dictionary definition of "artificial," leading it to erroneously conclude that the injury causing condition, a stump, is artificial because the natural condition of the water channel was changed by Washington Water Power Company (WWP). In reaching its conclusion, the majority misstates this court's holding in *Van Dinter v. City of Kennewick*, 121 Wn.2d 38, 846 P.2d 522 (1993), and attributes the natural occurrences of the high water and dying trees in the water channel to the man-made nature of the Long Lake reservoir.

I disagree with the majority's interpretation of the statute which effectively characterizes any man-made change in recreational use areas as an "artificial condition." Such a definition undermines the purpose of RCW 4.24.200 and 4.24.210 as well as a substantial body of case law decided under the statute, while providing no clear guidance for future courts' determination of whether an injury was sustained "by reason of a known dangerous artificial latent condition." RCW 4.24.210(3).

I. Artificial

The recreational use statute, RCW 4.24, is intended to encourage and protect owners of recreation areas who open their land to the public for recreational purposes. The statute applies broadly to all outdoor recreation, offering protection regardless of whether the land or water area is man made. As the majority recognizes, the statute's limitation on liability applies equally to areas which do not remain in a natural state, e.g., a gravel mound on an exca-

vation site, a logging road in the woods, a mixed-use trail in Seattle, and a scenic overlook bridge. Majority at 922-23. Moreover, the statute makes no distinction between artificial and natural bodies of water. The exception to the statutory grant of immunity is triggered only when each of the four elements, "known," "dangerous," "artificial," and "latent" is present in the alleged injury causing condition. *Tabak v. State*, 73 Wn. App. 691, 695, 870 P.2d 1014 (1994) (each condition must be present before a landowner's duty to warn arises).

Considering the exacting language of the statutory exception in conjunction with the legislative intent to encourage private landowners to open their land to the public and the incentive of landowner immunity set forth in RCW 4.24, it is clear that this court should narrowly interpret the terms "known," "dangerous," "artificial," and "latent." RCW 4.24.210(3). Nevertheless, the majority adopts a broad, literal dictionary definition of "artificial" as "a condition contrived through human effort," blurring the line between man-made changes which are protected under the statute and those which trigger liability.

In my view, this court should read "artificial condition" within the context of the statute as a whole and limit its meaning to conditions which are actually man made and not occurring in nature, rather than the dictionary definition adopted by the majority.[7] Such a construction would provide future courts with meaningful distinctions in the examination of whether an injury was sustained by reason

---

[7]In this regard, some courts have declined to adopt the dictionary definitions of terms because such definitions are too literal, and go beyond the scope of recreational use statutes. *Tijerina v. Cornelius Christian Church*, 273 Or. 58, 539 P.2d 634, 637 (1975) ("agricultural lands" not interpreted as land that could simply be farmed since the fact that land could be farmed does not distinguish it from most of the land in the state); *Herring v. Hauck*, 118 Ga. App. 623, 165 S.E.2d 198 (1968) (recreational use statute intended to encourage landowners to make premises available for recreational purposes did not apply to friendly neighbor who permitted neighbors and friends to use his backyard swimming pool without charge); *Shepard v. Wilson*, 123 Ga. App. 74, 179 S.E.2d 550 (1970) (even though recreational statute's express terms provide limited liability to landowner who directly or indirectly permits persons to use his property for recreational purposes without charge, statute did not apply to vacant lot in residential area). *See generally* John C. Barrett, *Good Sports and Bad Lands: The*

of a "known dangerous artificial and latent condition." RCW 4.24.210(3).

Turning to this case, we have recognized that regardless of whether a body of water is man made, changing contours in any given body of water are generally considered natural conditions. *Ochampaugh v. City of Seattle*, 91 Wn.2d 514, 524, 588 P.2d 1351 (1979) (slippery debris, changing contours and murky muddy waters of a manmade pond are natural conditions). The body of water at issue here is characterized by rising water levels and dying trees which are natural to a water channel. Given that bodies of water inevitably experience changing contours over time, including varying water levels and decaying trees, I cannot agree with the majority's characterization of these natural conditions in the water channel as artificial.

Although the majority places great weight on the rise in water level, the fact that construction of a dam caused a rise in the water level does not alter the analysis. As the Court of Appeals correctly held, higher water levels in the channel do not constitute an "artificial" condition merely because the changes may have been related to the erection of a dam. *Ravenscroft v. Washington Water Power Co.*, 87 Wn. App. 402, 412, 942 P.2d 991 (1997), *review granted*, 134 Wn.2d 1018 (1998) (citing *Chamberlain v. Department of Transp.*, 79 Wn. App. 212, 901 P.2d 344 (1995)); *also Meyer v. General Elec. Co.*, 46 Wn.2d 251, 280 P.2d 257 (1955) (within the context of attractive nuisance, manmade waterways were found to possess the same naturally occurring conditions as those in natural bodies of water).[8] To hold otherwise ignores the fact that the statutory immunity applies to both natural and man-made water areas.

*Application of Washington's Recreational Use Statute Limiting Landowner Liability*, 53 WASH. L. REV. 1, 22 (1977).

[8]Even if we consider the fact that Washington Water Power Company (WWP) increased power production and subsequently raised the water level of the reservoir in 1949, the water level of the reservoir has been maintained at a "normal pool elevation," and water naturally flowed into the row of trees, eventually killing the trees. Clerk's Papers (CP) at 176-77; 224-25. WWP cleared some of those dead trees in the area only after the trees died and left snags in the middle of the water channel. CP at 225.

In this case, there is no question that the specific instrument which caused plaintiff's injury was one of several submerged tree stumps. However, the existence of a tree stump and similar debris in bodies of water has already been determined to be natural conditions. *Swanson v. Mc-Kain*, 59 Wn. App. 303, 313-14, 796 P.2d 1291 (1990) (finding floating log or stump to be a natural condition of the water area). Clearly, this court should not interpret the existence of a submerged tree stump in a water channel any differently than one that is found floating there, since they are one and the same and both conditions are natural to bodies of water. *Id.* Just as the existence, evolution, and deterioration of trees are characteristic of the changing contours of the water channel, the submerged condition of the tree stumps here reflects a natural transformation of trees.

Interestingly, even under its broad definition, the majority in this case stops short of defining either the body of water or tree stumps as artificial. Rather, it erroneously draws on our decision in *Van Dinter* to find that it is the relationship of these natural conditions to each other which creates the artificial condition. In *Van Dinter*, this Court engaged in a two-step inquiry to analyze whether an injury is caused "by reason of a known dangerous artificial latent condition." *Van Dinter*, 121 Wn.2d at 43. The first step, the Court explained, is identification of the actual "condition" which allegedly caused the injury. *Id.* The plaintiff there claimed the proximity of a caterpillar play structure to the grassy area of the park was the injury-causing condition. The court agreed that the cause of the injury could not be regarded as the caterpillar in isolation from its surroundings. *Id.* This was true because the allegation was that if the border around the structure had been larger, plaintiff would not have been injured. *Id.* at 44. However, the court said, "[t]he caterpillar was thus not *in itself causally sufficient* to have caused the accident." *Id.* (emphasis added).

Rather than identifying the injury-causing condition and deciding whether that condition is artificial, the majority

determines whether the condition is "artificial" by asking whether the injury-causing condition's relationship to the recreational area is the result of man-made change. Read carefully, however, *Van Dinter* does not state a rule that the injury-causing condition must be examined in light of its surroundings to decide whether the condition is artificial. Instead, *Van Dinter* directs that *if* the external circumstances are causally part of the condition which caused the injury, *then* the surrounding circumstances must be considered in deciding whether a condition is latent or artificial.

Turning *Van Dinter* upside down, the majority collapses the two-step inquiry, determining whether the submerged stumps are artificial based on their relationship to the water channel. Because the water channel is affected by man-made changes, the majority concludes that the submerged stumps must be artificial. The problem with the majority's analysis is that it mistakenly attributes the natural occurrences in the water channel to WWP's normal use of the man-made reservoir, confounding the natural process of the trees' decay with the artificial existence and purpose of the hydroelectric project. In my view, the dispositive issue is whether, assuming the recreational area where the injury occurred is affected by man-made changes, the specific instrument that allegedly caused the injury is itself man-made and not a naturally occurring phenomenon in the area.

With nothing more than a dictionary definition of "artificial" and a confusing application of *Van Dinter*, future courts are left with little guidance in discerning the extent to which liability may arise due to injuries which are sustained as a result of man-made changes in recreational areas. This is particularly so given the cases which the majority acknowledges holding that man-made changes in recreational areas do not, as a general rule, trigger an exception to the immunity afforded by RCW 4.24.210. Rather than providing a definition consistent with the statute's purpose of encouraging owners and possessors of

potential recreation areas to open their property for public use, the majority's interpretation of "artificial" erodes the statutory protection extended to landowners, and creates uncertainty in what ought to be a narrow inquiry into landowner liability.

Although erection of the dam and varied use of the reservoir may have affected the water flow to the channel, characterizing the submergence of the tree stumps as an artificial condition ignores the practical reality that numerous man-made lakes, rivers, and creeks across our state simulate nature and undergo natural processes that change the character of an area over time.

II. Latent

Because the court should hold that the submerged tree stumps are not an artificial condition, it should be unnecessary to address the issue of whether the condition is latent. Nevertheless, the majority's analysis of the latency issue is also troublesome. That the submerged tree stumps are a natural occurrence in the water channel and that such a condition is characteristic of the changing contours of bodies of water suggest that the specific instrument which caused the injury is not latent. The majority believes that the record does not sufficiently support such a finding since other boaters indicated that the stumps were not apparent to them. However, as the court determined in both *Swanson* and *Ochampaugh*, dead trees and the changing contours of bodies of water are natural conditions which boaters in the area generally appreciate. Natural conditions in any given recreational area are characteristic of the area by definition. I would hold that as a matter of law the injury-causing condition was not latent. Just because a certain condition is not apparent to a particular user does not mean that it is not obvious and apparent to the general class of recreational users. *Van Dinter*, 121 Wn.2d at 46. Surely, a landowner is neither required to anticipate the various ways people might use its property, nor expected to predict the possible scenarios in which a user might fail to see a patent condition. *Tennyson v. Plum Creek Timber Co.*, 73 Wn. App. 550, 556, 872 P.2d 524 (1994).

Finally, I question the majority's analysis of the duty owed, assuming this is an artificial latent condition. In determining whether WWP has a duty to warn recreational users of the supposed underwater hazard of submerged tree stumps, the majority believes that a general warning of the condition would be sufficient, rather than cautioning recreational users with a specific warning of every submerged tree stump in the water channel. Granted, a general warning may not be burdensome to WWP, but such a remedy is meaningless, especially since dead trees and similar debris are presumed to be natural conditions in bodies of water. *Swanson*, 59 Wn. App. 303; *Ochampaugh*, 91 Wn.2d 514. In fact, the record indicates that many other recreational users were aware of the submerged tree stumps and excised caution. Clerk's Papers at 27-28; 49; 65; 104. It is unlikely that a general warning of the existence of submerged tree stumps in the area will prevent accidents such as the one in this case, since without specific warning of the tree stumps' exact location, the risks to boaters would remain the same.

## Conclusion

RCW 4.24 was enacted to promote public recreational opportunities. The public benefit of additional recreational use areas is at the expense of the private landowner whose cost is offset by a grant of immunity. Within the context of this complementary relationship, the question of whether a condition is "known," "dangerous," "artificial," and "latent," specifically determines the extent to which a landowner is liable and whether a recreational user has a claim for injuries sustained at the recreational use area. Ideally, the more certain landowners are of their liabilities and immunities, the more they will open their lands to the public.[9] To this end, the Legislature has clearly expressed its will. Rather than adding certainty to the relationship be-

---

[9]John C. Barrett, *Good Sports and Bad Lands: The Application of Washington's Recreational Use Statute Limiting Landowner Liability*, 53 WASH. L. REV. 1, 26 (1977).

tween the public and private landowner, however, the majority's literal interpretation of "artificial" goes beyond the scope of the statute and undermines the very purpose for which the recreational use statute was enacted. I respectfully dissent.

DURHAM, C.J., and TALMADGE, J., concur with MADSEN, J.

Reconsideration denied February 10, 1999.